UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSEANN ISAAC,

    Plaintiff,                                    Civil Action No. 09-12008

v.                                            HON. GEORGE CARAM STEEH
                                                 U.S. District Judge
                                                 HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL             U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff RoseAnn Isaac brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and Plaintiff's Motion for Summary Judgment DENIED.

## PROCEDURAL HISTORY

On March 16, 2006, Plaintiff filed an application for DIB and SSI, alleging an onset of disability date of June 13, 2005 (Tr. 143-148). After the initial denial of the claims, Plaintiff filed a request for an administrative hearing, held on October 3, 2008 in Detroit,

-1-

Michigan before Administrative Law Judge ("ALJ") Dean C. Metry (Tr. 20). Plaintiff, represented by attorney Vivian Hamm, testified, as did Lois Brooks, a Vocational Expert ("VE") (Tr. 24-46, 46-57). On December 18, 2008, ALJ Metry found that Plaintiff was able to perform her past relevant work (Tr. 19). On May 14, 2009, the Appeals Council denied review (Tr. 5-7). Plaintiff filed for judicial review on May 26, 2009.

## **BACKGROUND FACTS**

Plaintiff, born September 23, 1980, was age 28 when the ALJ issued his decision (Tr. 19, 149). She left school after ninth grade and worked previously as a cashier, office cleaner, and production worker (Tr. 174, 180). She alleges disability as a result of vascular disease, agoraphobia, anxiety, and an obsessive compulsive disorder ("OCD")(Tr. 173).

### A.     Plaintiff's Testimony

Plaintiff testified that she lived with her seven-year-old daughter and her mother in a single family home in Detroit, Michigan (Tr. 25-26). She reported that neither she nor her mother was employed, adding that she currently received government assistance (Tr. 26). Plaintiff, right-handed, stated that she left school after tenth grade, noting that she had not held a driver's license since failing to pay a traffic ticket fine (Tr. 27).

Plaintiff testified that she worked for a paper product company in 1998 and 1999, operating "a machine that made paper bags" (Tr. 28). She denied being fired from the factory position, noting that after leaving the paper company, she took part-time jobs working in a fast food restaurant and office cleaning (Tr. 28).

Plaintiff alleged ongoing symptoms of a panic disorder, agoraphobia, and OCD,

adding that she also experienced arterial vascular disease (Tr. 28-29). She stated that symptoms of a panic attack included a racing pulse, faintness or loss of consciousness, and flushing (Tr. 30). She also reported experiencing a heart attack (Tr. 30). She indicated that she experienced anxiety when around crowds or out in public (Tr. 31). Plaintiff, five months pregnant at the time of hearing, testified that she currently took one aspirin a day but had temporarily ceased taking heart or anxiety medication due to her pregnancy, adding that she regularly took Relegan, Prilosec, aspirin, and Darvocet (as needed) (Tr. 32-33). In addition to the heart and psychological conditions, Plaintiff alleged gallbladder disease and gastritis (Tr. 33).

Plaintiff alleged that on a typical day, she arose at 6:30 a.m., got her daughter ready for school, then watched television and slept for the remainder of the day unless she had a doctor's appointment (Tr. 33). She testified that she also saw her sister, who lived nearby, most days (Tr. 33-34). Plaintiff opined that she was unable to perform any full-time work, alleging difficulty performing "simple tasks at home" as a result of chest, back, leg pain, and headaches (Tr. 34-35). She stated that her prescribed medication made her drowsy (Tr. 38). She acknowledged that she continued to perform light housekeeping tasks and prepare simple meals (Tr. 35). Plaintiff also reported that she experienced radiating low back pain, noting that before her latest pregnancy, she took Vicodin and Motrin on a daily basis (Tr. 37). Plaintiff, testifying that she had been diagnosed with cervical cancer, stated that she planned to undergo a hysterectomy after the birth of her child (Tr. 39).

Plaintiff estimated that she could walk one block before experiencing heart

palpitations and pain (Tr. 41). She alleged that she was unable to stand for more than 20 minutes or lift more than five pounds (Tr. 42). In response to questioning by her attorney, Plaintiff reiterated that she experienced back pain and leg numbness, noting that elevating her legs relieved the condition (Tr. 43). She also alleged sleep disturbances (Tr. 44). Plaintiff reported that she was currently seeking psychiatric treatment for panic attacks (Tr. 45). She indicated that several members of her family, both on her mother and father's side, had died prematurely of heart attacks (Tr. 46).

**B.     Medical Evidence**

**1. Treating Sources[1]**

In May, 2005, Plaintiff reported back pain (Tr. 391-392, 800). The same month, Nabil Suliman, M.D., noting Plaintiff's elevated LDLs, recommended that she stop smoking (Tr. 465, 918). Henry Ford Health System records show that between February and November, 2005, Plaintiff sought emergency treatment on repeated occasions for chest pain (Tr. 289-322, 504-507).

A mental status examination from June, 2005 indicates that Plaintiff appeared anxious, withdrawn, and depressed (Tr. 514). Plaintiff reported panic attacks upon leaving her home (Tr. 515, 677). She was assigned a GAF of 52[2] (Tr. 515). The following month,

---

[1] July, 2007 nerve conduction study results contained in the transcript, stating that the subject is over 69 years old, were apparently included in error (Tr. 599-603, 852-856).

[2] A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34

Plaintiff noted that the fact that she lived in a high crime neighborhood contributed to her stress (Tr. 524-525). In August, 2005, Plaintiff told her therapist that she was making plans to go to an amusement park (Tr. 520). In September, 2005, Plaintiff, now taking Paxil, reported that she experienced fewer panic attacks, but "only can be around a small group of people" (Tr. 516). A November, 2005 heart catheterization showed the presence of single-vessel coronary disease (Tr. 326, 334, 461-462, 914-915). Plaintiff was prescribed aspirin, Lopressor, Zocor, Plavix, and Nitroglycerin (as needed) (Tr. 329, 905). Elias Kassab, M.D., advised Plaintiff to quit smoking (Tr. 330). Imaging studies of the chest showed normal results (Tr. 413-416).

January, 2006 treating notes indicate that Plaintiff experienced back pain as a result of a slip and fall (Tr. 373). March, 2006 consultation records, noting Plaintiff's recent myocardial infarction, state that Plaintiff experienced "unstable angina" (Tr. 351, 399, 449). Plaintiff was negative for a repeated heart attack (Tr. 401). An angioplasty showed a "[s]mall, fixed perfusion defect" of the anteroseptal wall but otherwise normal results (Tr. 403, 879). Other imaging studies of the chest were also normal (Tr. 397, 458, 891). April, 2006 treating records show that Plaintiff reported back pain (radiculopathy), but motor conduction studies performed the same month were normal (Tr. 366, 395, 872, 846). Diagnostic studies showed mild esophagitis (Tr. 453). Plaintiff was prescribed Tagamet (Tr. 453). In May, 2006 a CT scan of the lumbar spine was unremarkable (Tr. 851). July, 2006

---

(*DSM-IV-TR*) (4th ed.2000).

counseling notes indicate that Plaintiff had developed coping mechanisms for dealing with panic attacks and agoraphobia (Tr. 681). June and July, 2006 treating notes show that Plaintiff, reporting lower back pain, was prescribed Flexeril (Tr. 615, 649). An August, 2006 MRI of the lumbar spine was normal but an EMG study the same month show "evidence of chronic radiculopathy changes at L5-L1" (Tr. 845, 871).

In February, 2007, Plaintiff was diagnosed with cervical cancer, but opted to delay aggressive treatment until after having a second child (Tr. 591-592). Gunter Deppe, M.D., noted that Plaintiff continued to smoke (Tr. 595). March, 2007 imaging results of the heart were unremarkable (Tr. 660-663). In June, 2007, Plaintiff was prescribed Vicodin after reporting back pain (Tr. 651). Plaintiff, still taking Vicodin in November, 2007, reported calf pain (Tr. 715). The same month, she requested a prescription for Xanax (Tr. 714).

In January, 2008, Dr. Deppe again noted that Plaintiff continued to smoke (Tr. 695). March, 2008 treating notes indicate that Plaintiff continued to receive Vicodin (Tr. 706-707). Notes from a June, 2008 mental health assessment indicate that Plaintiff, previously a four-pack-a-day smoker, had cut down to two packs (Tr. 926). Plaintiff otherwise denied substance abuse or legal problems (Tr. 926-927). She was deemed cooperative and polite with normal perception and orientation (Tr. 929-930). Noting that Plaintiff had lost several family members over the past few years, the examining source speculated that Plaintiff's anxiety stemmed from her own health conditions and family losses (Tr. 931). Plaintiff was

assigned a GAF of 45 (Tr. 932).³

### 2. Consultive and Non-Examining Sources

In June, 2006, M. Bhausar, M.D., performed a psychiatric evaluation of Plaintiff on behalf of the SSA (Tr. 470-472). The psychiatrist noted that Plaintiff reported depression and anxiety lasting three years (Tr. 470). She alleged crying spells but denied suicidal ideation (Tr. 470). Plaintiff also reported symptoms of OCD, noting that she felt compelled to unplug all of the electrical appliances in her home (Tr. 470). She denied alcohol or drug abuse (Tr. 470).

Dr. Bhausar observed that Plaintiff sat comfortably in a chair for the duration of the interview, was in touch with reality, and exhibited a normal posture and gait (Tr. 471). She exhibited low self-esteem with a depressed mood (Tr. 471). Diagnosing Plaintiff with agoraphobia, OCD, depression, and arterial vascular disease, he assigned Plaintiff a GAF of 50 (Tr. 472). The following month, Tariq Mahmood, M.D., noting that Plaintiff's cardiovascular system was currently normal, found that the condition was non-severe (Tr. 475). In July, 2006, a Psychiatric Review Technique found that the presence of affective and anxiety disorders⁴ (Tr. 566, 569, 571). Plaintiff was deemed moderately limited in social

---

³ A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* ) (4th ed.2000).

⁴Confusingly, the same evaluator completed two other Psychiatric Review Technique forms, finding insufficient evidence to support Plaintiff's claim of anxiety-related disorders (Tr. 534, 548). Given the fact that a third Review found the presence of both affective and

functioning and concentration, persistence, and pace (Tr. 576). The Review noted that Plaintiff had not experienced episodes of decompensation or experience trouble carrying out activities of daily living (Tr. 577- 578). The same month, a Mental Residual Functional Capacity Assessment found that Plaintiff experienced moderate limitations in understanding and remembering detailed instructions, maintaining concentration for extended periods, accepting instruction, and responding appropriately to criticism (Tr. 562-563).

C.     **Vocational Expert Testimony**

VE Lois Brooks classified Plaintiff's former work as a machine feeder (Dictionary of Occupational Titles, code 715.686-014) as unskilled and exertionally light[5] (Tr. 47). The ALJ posed the following hypothetical limitations to the VE, taking into account Plaintiff's age, education, and work background:

> "This hypothetical claimant can only perform light work as that term is defined. Further, however, this hypothetical claimant can only perform routine and repetitive tasks, have occasional public contact, cannot work in team or tandem"

(Tr. 47-48). The VE responded that the hypothetical individual could perform Plaintiff's past

---

anxiety disorders (consistent with the consultive examiner's findings) the undersigned assumes that the first two were submitted in error.

[5] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

relevant work as a paper feeder (Tr. 48). The VE testified further that if the same individual were additionally limited to sedentary work, she would be unable to perform Plaintiff's former job but could work as an assembler (2,500 jobs in the regional economy), inspector or sorter (1,000) and packager (800) (Tr. 48).

The VE found that if Plaintiff's claim that she was continually fatigued and needed to recline multiple times each day was fully credited, she would be unable to perform any work (Tr. 48). The VE testified that her job findings were consistent with the Dictionary of Occupational Titles ("DOT"), but noted that her testimony regarding the sit/stand option was based on her own professional experience (Tr. 49). In response to questioning by Plaintiff's attorney, the VE testified that panic attacks occurring more than once a month, the need to elevate one leg constantly, or absenteeism due to doctors appointments more than twice a month would preclude all full-time employment (Tr. 49-50).

**D. The ALJ's Decision**

Citing Plaintiff's medical records, ALJ Metry found that Plaintiff experienced the severe impairments of " depression, anxiety, status post heart attack, cardiovascular disease, and cervical cancer," determining however that none of the conditions met or medically equaled the listed impairments found in Appendix 1, Subpart P, Regulation No. 4 (Tr. 14-15).

The ALJ found that Plaintiff retained the residual functional capacity ("RFC") "to perform light work," limited to "routine, repetitive tasks, only occasional contact with the public," with a preclusion on "work activities on a team or in tandem" (Tr. 16-17). Citing the VE's testimony, he concluded that Plaintiff was capable of performing her past relevant

work as a machine feeder (Tr. 19).

The ALJ found Plaintiff's allegations of disability "not credible to the extent they are inconsistent with the . . . residual functional capacity assessment" (Tr. 18). He noted that Plaintiff's conditions of OCD and anxiety did not prevent her from "driving, shopping, and going to medical appointments" (Tr. 17). The ALJ noted that although Plaintiff was currently undergoing therapy, her treatment for her psychological conditions had been sporadic (Tr. 17).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of

whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. Substantial Evidence

Plaintiff argues that the Residual Functional Capacity does not account for the full impact of both her mental and physical limitations. She contends that the ALJ's failure to

-11-

include Dr. Suliman's diagnosis of radiculopathy among her severe impairments at Step Two of the analysis taints the ultimate finding that she was capable of returning to her former work. *Plaintiff's Brief* at 14-16, *Docket #8.* She also contends that the ALJ erred by overlooking a June, 2008 mental health assessment (Tr. 932).

"[T]he second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." An impairment can be considered "not severe . . . only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.'" *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir. 1985) (*citing Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)).

First, substantial evidence supports the ALJ's finding that Plaintiff's back condition was non-severe. Plaintiff's application for benefits, listing vascular disease and various psychological conditions as reasons for her alleged disability, omits all mention of a back condition (Tr. 173). Evidence found elsewhere in record supports the ALJ's finding. In June, 2006 a consultive psychological examiner observed that Plaintiff appeared remained seated for the duration of the assessment without discomfort (Tr. 471). The ALJ, while acknowledging Dr. Suliman's finding of radiculopathic changes at L5-S1, also observed that imaging studies of the back and lower extremities were largely unremarkable (Tr. 18). April, 2006 motor conduction studies were normal (Tr. 366, 395, 846, 872). A May, 2006 CT scan was similarly unremarkable (Tr. 851). The presence of a single study from August, 2006

showing evidence of radiculopathy did not require the ALJ to find that the condition created workplace limitations (Tr. 871). Notably, a lumbar spine MRI taken the same month was normal (Tr. 845). Plaintiff also relies on the results of a July 18, 2007 EMG study to show that she experienced ongoing radiculopathy. However, a review of the findings shows that these tests were performed on a different individual who was over the age of 69 and 5'4" tall (Plaintiff was in her late 20's and stood 5'1" tall) and were included in Plaintiff's transcript by accident (Tr. 602, 172). Plaintiff's claim that the ALJ erred in failing to consider the back condition at Step Three is likewise defeated by the fact that substantial evidence supports the finding that the back condition was not a severe impairment.

Plaintiff's Step Two argument also fails to the extent that she frames the radiculopathy omission as a failure to adopt a treating physician's opinion. She asserts that Dr. Suliman's treating notes stating that she experienced radiculopathy were "disregarded." *Plaintiff's Brief* at 15. To be sure, an ALJ must give "good reasons" for rejecting treating physician's opinion. *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004)(*citing* 20 C.F.R. § 404.1527(d)(2)). Nonetheless, because the ALJ did not "reject" Dr. Suliman's findings (in fact the ALJ acknowledged the presence of radiculopathy) the treating physician rule does not apply. Instead, the ALJ permissibly determined that objective testing did not support Plaintiff's alleged level of limitation (Tr. 18).

The argument that the ALJ erred by failing to discuss a June, 2008 mental health intake assessment is also unavailing. *Plaintiff's Brief* at 15-16. The ALJ, having discussed Plaintiff's mental health history at length, was not required to discuss every piece of evidence

supporting Plaintiff's disability claim. "While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each . . . opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *Kornecky v. Commissioner of Social Security,* 2006 WL 305648, *8-9 (6th Cir. 2006)(*citing Loral Defense Systems-Akron v. N.L.R.B.,* 200 F.3d 436, 453 (6th Cir.1999)).

Plaintiff also cites *Cohen v. Secretary of H.H.S.,* 964 F.2d 524 (6th Cir. 1992), apparently for the proposition that the ALJ was required to perform a treating physician analysis of the June, 2008 mental assessment. However, a review of this material indicates that the examining source, performing an intake assessment, did not have a treating relationship with Plaintiff [6] (Tr. 925). As such, the findings were "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)(*citing Atterberry v. Secretary of Health & Human Servs.,* 871 F.2d 567, 572 (6th Cir.1989)).

**B. Credibility**

Plaintiff, citing *Walston v. Gardner,* 381 F2d 580, 585-586 (6th Cir. 1987), contends that the ALJ placed exaggerated emphasis on her daily activities to support his non-disability determination. *Plaintiff's Brief* at 16-18. She also argues that the ALJ improperly discounted her alleged degree of limitation caused by back trouble and the cardiac condition. *Id.* at 17-18.

---

[6]Moreover, the record does not show that Plaintiff followed up with the proposed treatment.

The ALJ's credibility determination was both procedurally and substantively adequate. "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986); SSR 96-7p. Here, the ALJ acknowledged that Plaintiff experienced a history of cardiac problems, cervical cancer, and depression and anxiety. As discussed above, the ALJ's finding that Plaintiff experienced only non-severe back problems is well-supported by the record.

Second, pursuant to SSR 96-7p, the ALJ considered Plaintiff's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms" of her condition (Tr. 17). Although Plaintiff argues that the ALJ neglected to consider all of the factors to be considered in making a credibility determination, a review of the administrative opinion indicates otherwise.[7] Acknowledging Plaintiff's claims that she experienced "sweating, trouble breathing and then passing out: as a result of anxiety," the ALJ

---

[7]C.F.R. 404.1529(c)(3); 416.929(c)(3) lists the factors to be considered in making a credibility determination:
> "(i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

determined that her claims were undermined by the fact that her mental health treatment tapered off, then ended completely starting in the second half of 2006 (Tr. 17). He noted further that limitations as a result of OCD (as described by Plaintiff) did not preclude all work (Tr. 17-18). Citing treating records, he found that Plaintiff's cardiac condition was stable and that she had opted out of agressive treatment for the cervical condition until after completing her family (Tr. 18).

Moreover, the two-page credibility analysis, acknowledging claims of agoraphobia, permissibly cited Plaintiff's continued ability to drive, shop, and attend frequent medical appointments (Tr. 17). Although Plaintiff argues that her ability to perform these tasks intermittently does not establish disability, the finding that she exaggerated her limitations is also supported by both treating and consultive sources (Tr. 17-18). Contrary to her contention that she was required to take medications that created drowsiness, during the course of her most recent pregnancy she discontinued all medication except for one aspirin per day (Tr. 32-33, 37).

Finally, Plaintiff disputes the ALJ's conclusion that her fatigue and lower extremity problems were possibly attributable her current pregnancy. However, even assuming that this finding was an insufficient basis to discount her claims, the credibility determination is otherwise amply supported by the record and should not be disturbed. *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993); *See also Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir. 1989)(*citing Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view

of the cold record'").

**C. The Hypothetical Question**

Plaintiff again faults the ALJ for finding that her alleged back condition was non-severe and omitting discussion of some of her mental health records. *Plaintiff's Brief* at 19-20. She argues that the VE's testimony that she could return to her former work is invalidated by the hypothetical question's omission of key impairments. *Id.*

Consistent with this argument, "[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays plaintiff's individual physical and mental impairments." *Varley v. Secretary of HHS*, 820 F.2d 777, 779 (6th Cir. 1987) (internal citations omitted).

However, as discussed in Section **A.,** substantial evidence supporting the ALJ's omission of back problems at Step Two also support the omission of this allegation from the hypothetical question and RFC. "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994); *Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987). Likewise, while Plaintiff contends that the question did not reflect her full degree of psychological impairment, the query to the VE limited Plaintiff to "routine and repetitive tasks" with only "occasional public contact" and a preclusion on all teamwork (Tr. 47-48). These limitations are consistent with the record as a whole. Plaintiff acknowledged in September, 2005 she could function within "a small group of

people" (Tr. 516). Her August, 2005 statement that she was planning a trip to an amusement park also contradicts allegations that agoraphobia kept her mostly housebound (Tr. 520).[8] July, 2006 counseling notes also indicate that Plaintiff's condition improved with medication and therapy (Tr. 681).

In closing, the Court notes that its recommendation to uphold the administrative decision is not intended to trivialize Plaintiff's past or present conditions. Indeed, the record indicates that she has faced some formidable health issues in her relatively young life. However, the administrative finding that Plaintiff is nonetheless capable of returning to her former job as a production worker/machine feeder falls well within the "zone of choice" accorded to the fact-finder at the administrative level. Pursuant to *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc), the ALJ's decision should not be disturbed by this Court.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and Plaintiff's Motion for Summary Judgment DENIED.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of

---

[8]More obviously, the ALJ, determining at Step Four of his analysis that Plaintiff could perform her past relevant work, was permitted but not required to take VE testimony. *Studaway v. Secretary of Health and Human Services,* 815 F.2d 1074, 1076 (6th Cir.1987); *See also Mays v. Barnhart,* 78 Fed. Appx. 808, 813-814 (3rd Cir. 2003)("At step four of the sequential evaluation process, the decision to use a vocational expert is at the discretion of the ALJ")

appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen  
R. STEVEN WHALEN  
UNITED STATES MAGISTRATE JUDGE

Dated:  April 16, 2010

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 16, 2010.

S/G.  Wilson  
Judicial Assistant